Ronald L. RUNNETT; Moira H.R.
Runnett, Plaintiffs–Appellants,

v.

George P. SHULTZ; Secretary of State;
Department of Justice; Immigration
and Naturalization Service of the Unit-
ed States of America, Defendants–Ap-
pellees.

No. 89–55354.

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 5, 1989.*

Decided April 20, 1990.

Ronald L. Runnett and Moira H.R. Run-
nett, San Diego, Cal., pro se.

Samuel W. Bettwy, Sp. Asst. U.S. Atty.,
San Diego, Cal., for defendants-appellees.

* The panel finds this case appropriate for submis-
sion without oral argument pursuant to Ninth

Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Before GOODWIN, Chief Judge, SCHROEDER and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

This appeal raises the issue of whether, under the 1940 Nationality Act, a United States citizen successfully transmitted citizenship to her child born abroad.

## I

Ronald Runnett ("Ronald"), a forty-seven-year-old native and citizen of Canada, contends that he acquired United States citizenship at birth from his mother, Moira Runnett ("Moira"). Although Moira was born in Canada, she is a U.S. citizen by virtue of her father's U.S. citizenship. From approximately 1916 through 1918, Moira resided in the United States with her parents. At all other times prior to Ronald's birth, Moira lived in Canada. Ronald's father is a Canadian citizen.

In July 1987, Ronald applied for a United States passport. His application was rejected because Moira was deemed not to have satisfied the necessary residency requirement under section 201(g) of the Nationality Act of 1940 to transmit U.S. citizenship to Ronald.

In September 1987, the Runnetts filed this action pro se in district court against the Secretary of State, in his official capacity, and the U.S. Immigration and Naturalization Service ("INS"). Seeking declaratory relief against the government, the Runnetts requested that the district court declare Ronald a U.S. citizen. On August 17, 1988, the government filed a motion for summary judgment on behalf of all named defendants. The district court granted the motion, finding that Ronald was not a citizen of the United States because Moira had failed to satisfy the residency requirement to transmit U.S. citizenship. Moreover, the court concluded that even if citizenship had been transmitted to Ronald, he had failed to meet the statutory requirement to retain citizenship.

Ronald and Moira now appeal pro se from the district court's judgment.

## II

The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth. See, e.g., Rodriguez–Romero v. INS, 434 F.2d 1022, 1023 (9th Cir.1970) (per curiam), cert. denied, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971). When Ronald was born in December 1941 in Canada, the requirements for transmitting and retaining U.S. citizenship were controlled by section 201(g) of the 1940 Nationality Act.[1]

Under this section, Moira was required to reside in the United States for ten years prior to Ronald's birth in order to be able to transmit her U.S. citizenship to Ronald. Although the Runnetts do not allege that Moira factually satisfied the ten-year residence requirement, they argue that Moira "constructively" satisfied the requirement and that the 1940 Act's Saving Clause applies, making the requirement inapplicable to their case. We consider each argument in turn.

### A

The Runnetts contend that Moira "constructively" satisfied the requirement

---

1. This section states in pertinent part that:
   The following shall be nationals and citizens of the United States at birth:
   ....
   (g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: *Provided,* That in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years....
   Section 201(g), Nationality Act of 1940, 54 Stat. 1138.

because she was ignorant of her U.S. citizenship until after Ronald's birth.[2] The Runnetts rely upon Board of Immigration Appeals ("BIA") decisions in support of this argument.

Some BIA decisions suggest that constructive residence is recognized in citizenship retention cases when the individual was ignorant of his claim to U.S. citizenship. For example, in *In re Farley*, 11 I. & N. Dec. 51 (1965), the BIA recognized constructive residence when Farley failed to meet the statutory residency requirements necessary to retain his U.S. citizenship. The BIA stated that:

> Constructive residence and physical presence in the United States are concepts regularly given effect in the field of immigration and nationality law.... [I]n considering the question of whether United States citizenship was retained under a [particular] statute ..., the Attorney General ruled that the retention requirements were satisfied although factually residence was not taken up until after that age because of conditions beyond the control of the child.

*Id.* at 53. Applying this principle, the BIA noted that Farley had "no knowledge of his possible claim to citizenship until he applied for an immigrant visa" and, at that time, Farley could not have factually met the statutory requirement necessary to retain his U.S. citizenship. *Id.* at 52. The BIA concluded that Farley's "constructive physical presence, coupled with his actual physical presence, amounted to a full compliance with [U.S. citizenship] retention requirements...." *Id.* at 54.

Similarly, in *In re Yanez–Carrillo*, 10 I. & N. Dec. 366 (1963), the BIA applied the principle of constructive residence to allow Yanez–Carrillo to remain a U.S. citizen when he had not realized that he had a claim to U.S. citizenship in time to satisfy the requirement to retain his citizenship.

There are, however, three reasons why these BIA decisions offered by the Runnetts are not controlling. First, these decisions applied the theory of constructive residence to retention of citizenship cases and not to transmission of citizenship cases.[3] The Runnetts urge that the constructive residence theory should also apply to citizenship transmission cases. The application of constructive residence to citizenship retention cases, however, does not necessarily support its application to citizenship transmission cases. As indicated in *Rogers v. Bellei*, 401 U.S. 815, 821–22, 91 S.Ct. 1060, 1064, 28 L.Ed.2d 499 (1971), courts have traditionally hesitated to find that Congress could take away citizenship without the citizen's consent. This concern has led to the application of constructive residence in order to preserve an individual's retention of citizenship. Similar concern, however, could not exist for the transmission of citizenship where citizenship is simply not being conferred.

Second, we have previously held that the application of constructive residence is inappropriate under section 201 in a citizenship transmission case. In *Rodriguez–Romero*, 434 F.2d at 1023, the appellant argued that he could not be deported following his conviction on a charge of trafficking in marijuana because he was a U.S. citizen. This court noted that although Rodriguez–Romero's father was a U.S. citizen, he failed to establish "residence" in the U.S. for the necessary ten-year period to transmit citizenship to Rodriguez–Romero. The court rejected the contention that Rodriguez–Romero's father had "constructive residence" in the U.S., emphasizing that only objective facts and not subjective intent would be considered when applying

---

2. The Runnetts allege that they were ignorant of their claim to U.S. citizenship and the requirements of section 201(g) until 1986.

3. The Runnetts offer *In re Navarrete*, 12 I. & N. Dec. 138 (1967), as an example of applying constructive residence in a transmission of citizenship case. However, the BIA concluded only that Navarrete had relied upon a U.S. official's erroneous interpretation of law and thus she had constructively completed the necessary residency requirements to retain her U.S. citizenship, and that her constructive residency period could apply to the requirement necessary to transmit citizenship to her foreign-born children.

the requirements of section 201 of the Nationality Act. *Id.* at 1024.

Finally, application of constructive residence in this case is inconsistent with the general purpose of the 1940 Nationality Act. In introducing these statutory requirements, the 1940 Act sought to

> prevent the perpetuation of United States citizenship by citizens born abroad who remained there, or who may have been born in the United States but who go abroad as infants and do not return to this country. Neither these persons nor their foreign-born children would have a real American background or any interest except that of being protected by the United States while in foreign countries.

S.Rep. No. 2150, 76th Cong., 3d Sess. 4, *quoted in* 4 C. Gordon, *Immigration Law & Procedure,* § 13.4c, at 13–21. Indeed, the policy suggests that the statutory requirements were directly aimed at cases like the Runnetts'.

### B

The Runnetts next assert that the Savings Clause of the 1940 Nationality Act [4] preserves Moira's ability to transmit her American citizenship to Ronald under the pre–1940 laws. Application of the 1940 Act's Savings Clause may allow Moira to transmit her U.S. citizenship to Ronald because, prior to the 1940 Nationality Act, there was no statutory requirement specifying the duration of the citizen parent's residence in the United States to transmit citizenship. *See* 4 C. Gordon, *supra,* § 13.4c, at 13–18.

We disagree. In *Rodriguez–Romero,* this court considered whether the 1940 Act's Savings Clause would apply in a situation similar to the one presented by the Runnetts. Like Ronald, Rodriguez–Romero claimed U.S. citizenship through a parent, who had failed to satisfy the residence requirement to transmit U.S. citizenship under the Nationality Act. Rodriguez–Romero also argued that the 1940 Act's Savings Clause applied and therefore that he was a citizen by virtue of the pre–1940 law. This court rejected Rodriguez–Romero's argument because the 1940 Act's Savings Clause "did not extend to provisions ... relating to nationality at birth, but was expressly limited to the preservation of provisions relating to nationality through naturalization and to several miscellaneous matters irrelevant to appellant's claim." *Rodriguez–Romero,* 434 F.2d at 1024. Similarly, the 1940 Act's Savings Clause does not apply to the Runnetts' case.

The Runnetts nonetheless urge us to consider *Bertoldi v. McGrath,* 178 F.2d 977 (D.C.Cir.1949), and *United States v. Menasche,* 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955). The Runnetts contend that these cases suggest that the 1940 Act's Savings Clause applies to them. We disagree.

In *Bertoldi,* the D.C. Circuit held that a broad application of the 1940 Act's Savings Clause was appropriate in a naturalization case. Under the pre–1940 law, Bertoldi would have derivatively become a citizen upon the expiration of a five-year residency. Prior to the elapsed period, the law was repealed by the 1940 Nationality Act. The question before the court was whether Bertoldi's partly completed process of becoming a citizen was covered by the Savings Clause. The D.C. Circuit held that it was. The court reasoned that the words of the Savings Clause of 1940 "evince a clear intent on the part of Congress that the new [1940] act should take effect prospectively. We think that the [1940] act meant that rights partly accrued under the old act

---

**4.** The Savings Clause of the 1940 Nationality Act states in pertinent part that:

Nothing contained in either chapter III or chapter V of this Act, unless otherwise provided therein, shall be construed to affect the validity of any declaration of intention, petition for naturalization, certificate of naturalization, or of citizenship, or other document or proceeding which shall be valid at the time this Act shall take effect; or to affect any prosecution, suit, action, or proceedings, civil or criminal, brought, or any act, thing, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all such prosecutions, suits, actions, proceedings, acts, things, or matter, the statutes or parts of statutes repealed by this Act, are hereby continued in force and effect.

Section 347(a), Nationality Act of 1940, 54 Stat. 1168.

should not be disturbed by the new." *Bertoldi*, 178 F.2d at 978. *Bertoldi*, however, created a conflict with a Second Circuit case, *United States ex rel. Aberasturi v. Cain*, 147 F.2d 449 (2d Cir.1945). In *Aberasturi*, the Second Circuit held that the 1940 Act's Savings Clause would not apply to a similar fact situation.

The Supreme Court, in *Menasche*, considered whether the Savings Clause of the 1952 Immigration and Nationality Act permitted Menasche to become a naturalized citizen under the terms of the 1940 Act. In the 1952 Act's Savings Clause, Congress added "status, condition, [and] right in process of acquisition" as being covered by the Savings Clause. Section 405, Nationality Act of 1952, 66 Stat. 163, 280. The Court reasoned that these changes were prompted by inconsistent interpretations of the 1940 Act's Savings Clause as evidenced by the *Aberasturi–Bertoldi* conflict. *Menasche*, 348 U.S. at 533–34, 75 S.Ct. at 516–17. The Court, however, did not explicitly resolve the *Aberasturi–Bertoldi* conflict.

*Menasche* suggests a liberal application of the 1952 Act's Savings Clause; but, as the government points out, the Supreme Court was interpreting the Savings Clause of the 1952 Act, not the 1940 Savings Clause which the Runnetts invoke in this case. Moreover, *Menasche* and *Bertoldi* addressed the issue of naturalization, not nationality at birth. Therefore, for the purpose of addressing the Runnetts' claim that the Savings Clause of the 1940 Act preserved Moira's ability to transmit U.S. citizenship to Ronald, *Menasche* is not dispositive.

In sum, given this court's holding in *Rodriguez–Romero* and the limited applicability of *Menasche*, the Runnetts cannot rely on the 1940 Act's Savings Clause to allow Moira to transmit U.S. citizenship to Ronald.[5]

### III

The Runnetts also allege that there are several constitutional infirmities in the

1940 Act. We consider each contention below.

### A

■ The Runnetts first argue that in depriving Ronald of U.S. citizenship, the 1940 Act's residency requirements violated his constitutional rights to citizenship. This argument is without merit for several reasons.

First, the Supreme Court in *Bellei* specifically examined and upheld the constitutionality of Congress' regulation of the retention of citizenship. The Court drew a distinction between fourteenth amendment citizens (those born or naturalized in the United States) and those whose citizenship was created by congressional enactment. *Bellei*, 401 U.S. at 827–28, 91 S.Ct. at 1067. Fourteenth amendment citizenship was held to be beyond the power of the government to take away without the consent of the citizen. Congress can, however, impose conditions on non-fourteenth amendment citizenship. *Id.* at 831–32, 91 S.Ct. at 1069.

Furthermore, this court has upheld the constitutionality of residence requirements for retaining citizenship even when noncompliance with the regulation was due to ignorance. In *Ramos–Hernandez v. INS*, 566 F.2d 638 (9th Cir.1977), the appellant argued that because he had been unaware of the residence requirements for retaining citizenship, he had been unable to satisfy the requirements within the prescribed period. In considering whether Ramos' constitutional rights were violated by the application of the statutory residence requirements even though Ramos was ignorant of them, this court noted that the Supreme Court in *Bellei* had left open the question whether constitutional rights would be violated in cases of ignorance, mistake or hardship. *Id.* at 642. We reasoned that since "the loss of non-Fourteenth Amendment citizenship can constitutionally occur

---

**5.** Because we conclude that Moira failed to satisfy the requirement of section 201(g) to transmit citizenship to Ronald, we need not reach the

question of whether Ronald satisfied the statutory requirement to retain citizenship.

even if the individual does not voluntarily relinquish it," it does not "make a difference if the relinquishing was involuntary because of an ignorance of the statutory requirements...." *Id.* at 645.

B

 The Runnetts also argue that the equal protection component of the fifth amendment is violated because the 1940 Nationality Act allows for more lenient treatment for illegitimate children born abroad.[6] We disagree.

The Supreme Court has recognized that Congress has almost plenary power in immigration legislation. *See, e.g., Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2582–84, 33 L.Ed.2d 683 (1972). This court considered whether the Immigration and Nationality Act of 1952 violated the equal protection clause of the fifth amendment because, as interpreted by the district court, a homosexual marriage did not confer "spouse" status to an alien under the Act. *Adams v. Howerton,* 673 F.2d 1036 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). In determining that the Act did not violate the equal protection clause, we observed that "where there is a rational basis for Congress's exercise of its power, whether articulated or not, the [c]ourt will uphold the immigration laws that Congress enacts." *Id.* at 1042 (citations omitted).

One obvious rational basis for a more lenient policy towards illegitimate children of U.S. citizen mothers is that illegitimate children are more likely to be "stateless" at birth. Courts have noted the strong policy of protecting individuals from "stateless" status. *See Rogers v. Bellei,* 401 U.S. at 836, 91 S.Ct. at 1071. As the government notes, if the U.S. citizen mother is not a dual national, and the illegitimate child is born in a country that does not recognize citizenship by *jus soli* (citizenship determined by place of birth) alone, the child can acquire no citizenship other than his mother's at birth. This policy clearly demonstrates a "rational basis" for Congress' more lenient policy towards illegitimate children born abroad to U.S. citizen mothers.

C

 The Runnetts finally assert that the fifth amendment due process clause is violated by the 1940 Act's regulations. Specifically they argue that Moira's rights to travel, to live and to marry internationally, and to raise a family have been violated. This court has already held that the requirements of section 201(g) of the Nationality Act do not violate due process. *Uribe–Temblador v. Rosenberg,* 423 F.2d 717 (9th Cir.1970) (per curiam). "[W]e cannot say the classifications [of section 201(g)] are so unreasonable as to violate due process." *Id.* at 718.[7]

AFFIRMED.

---

**6.** The 1940 Nationality Act provides that an illegitimate child born abroad may take the mother's U.S. citizenship if she had previously resided in the United States while a legitimate child may take his parent's citizenship only if the parent satisfied the ten-year residence requirement.

**7.** Finally, we reject other arguments raised by the Runnetts that do not merit discussion here.