Thadeus DROZD, a/k/a Adam
Passoni, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Docket No. 97–4241.

United States Court of Appeals,
Second Circuit.

Argued May 22, 1998.

Decided Aug. 24, 1998.

Stephen Posner, Hempstead, NY (Posner & Gaier, Hempstead, NY, of counsel),for Petitioner.

Heidi A. Wendel, Assistant United States Attorney, Southern District of New York, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Diogenes P. Kekatos, Steven M. Haber, Assistant United States Attorneys, Southern District of New York, New York City, of counsel), for Respondent.

Before: MESKILL and KEARSE, Circuit Judges, and TELESCA,* District Judge.

---

* The Honorable Michael A. Telesca, United States District Judge for the Western District of New York, sitting by designation.

1. The recently enacted Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) repealed section 106 of the 1952 Act, 8 U.S.C. § 1105a and added section 242, 8 U.S.C.A. § 1252, to govern judicial review of immigration matters. *See* IIRIRA, Pub.L. No. 104–208, § 306(a)-(b), 110 Stat. 3009–546, 607,

MESKILL, Circuit Judge:

Petitioner Thadeus Drozd (Drozd), a/k/a Adam Passoni seeks review of an order of the Board of Immigration Appeals (BIA) dated July 23, 1997, which dismissed Drozd's appeal and upheld the decision of an immigration judge to deny Drozd's application for termination of deportation proceedings based on United States citizenship and to order him deported based on repeated criminal conduct. On this petition for review, pursuant to section 106(a)(5) of the Immigration and Nationality Act of 1952, as amended (the "1952 Act"), 8 U.S.C. § 1105a(a)(5), Drozd contends principally that because he is a United States citizen, we should vacate the deportation order.[1] Alternatively, Drozd argues that genuine issues of material fact as to his nationality are presented which require us to transfer the proceedings to the United States District Court for a hearing on his nationality claim. For the reasons set forth below, the petition for review of the BIA's decision is denied.

## BACKGROUND

Drozd was born in Poland on September 25, 1953 and entered the United States on June 17, 1959, as an immigrant pursuant to an immigrant visa. At no time after his arrival in the United States did Drozd seek to become a naturalized citizen.

Drozd has an extensive criminal record. It includes a conviction on September 26, 1975, in New York State Supreme Court, Kings County, of attempted robbery, for which he was sentenced to four to eight years imprisonment. In addition, he was convicted on May 19, 1989, in New York State Supreme Court, Westchester County, of burglary and conspiracy to commit murder, for which he was sentenced to three to six years imprisonment for burglary and fif-

612 (1996), *amended by* Extension of Stay in United States for Nurses, Pub.L. No. 104–302, § 2, 110 Stat. 3656, 3657 (1996). Where, as here, however, deportation proceedings are commenced prior to the April 1, 1997 effective date of Title III–A of IIRIRA, former section 106, with the addition of some transitional changes, governs our consideration of this petition. *See* IIRIRA, § 309(c)(1)(B) & (4), 110 Stat. at 3009–626.

ty-four months to nine years imprisonment for conspiracy to commit murder.

On June 10, 1994, the INS initiated deportation proceedings against Drozd with the issuance of an Order to Show Cause, which was partially superseded and amended on November 1, 1995. Drozd was charged with deportability pursuant to section 241(a)(2)(A)(ii) of the 1952 Act, 8 U.S.C. § 1251(a)(2)(A)(ii) (presently codified as amended at 8 U.S.C.A. § 1227), for commission of at least two crimes of moral turpitude not arising out of a single scheme of criminal conduct, that is, the 1975 attempted robbery conviction and 1989 conviction for burglary and conspiracy. Drozd was also charged with deportability pursuant to section 241(a)(2)(A)(iii) of the 1952 Act, 8 U.S.C. § 1251(a)(2)(A)(iii), as an aggravated felon.

On December 6, 1994, Drozd's deportation hearing commenced and was adjourned numerous times at Drozd's request to allow him to obtain evidence. On July 15, 1996, at the reconvened hearing, Drozd admitted to the criminal convictions that were the basis of the INS's charge of deportability, but claimed that he was not deportable because he was a United States citizen, having acquired his citizenship from his United States citizen father, Edward Drozd, who allegedly served as a United States government employee in Eastern Europe. To support his claims, Drozd proffered the testimony of his brother Joseph Drozd, his cousin Edward Drozd, and his father's friend Bill Pisoney, as well as documentary evidence to reconstruct his father's activities prior to Drozd's birth. The evidence revealed the following.

Petitioner's father, Edward Drozd, was born in the United States on October 17, 1917. On May 28, 1920, Edward, at age two-and-one-half years, left the United States with his family and moved to Poland. By the late 1930s, Edward Drozd wanted to return to the United States but was unable to for financial reasons and the subsequent Nazi invasion of Poland. During World War II, Edward Drozd joined a Polish partisan unit that fought the Nazis. In 1940, Edward Drozd was arrested by the Nazis for being active in the resistance and was imprisoned in Poland. While the duration of his impris-

onment is unclear, the record indicates Edward Drozd was in Poland until 1944.

In October 1944, Edward Drozd was arrested by the Soviets and imprisoned until after the war. Again, while the date of his release from prison is unclear, the evidence indicates that Edward Drozd was released as early as January 1945 and appeared at the American Consulate in Berlin, Germany to request a passport and other assistance to return to the United States as a citizen. The Consul instructed him to return to Poland to obtain supporting documentation. On March 29, 1946, Edward Drozd presented the documentation at the United States Embassy in Warsaw, Poland, submitted an application for a passport, and registered for the United States Selective Service. Although the United States Embassy approved Edward Drozd's application on July 3, 1946, he was unable to leave for the United States because he was arrested and imprisoned in Poland on charges of collaboration with the Nazis. He was released in 1949, attempted to leave the country, but was refused an exit permit by the Polish authorities, who considered him solely a Polish citizen.

Edward Drozd was married in 1951 and had children in Poland, including petitioner Thadeus Drozd. In 1958 Edward Drozd was issued a passport and an exit permit. He traveled back to the United States with his wife and children in 1959.

Petitioner alleges that during the period 1945 through 1958, his father may have worked as a United States government agent. Petitioner bases this belief on Bill Pisoney's testimony at the deportation hearing that Edward Drozd had told him that prior to coming to the United States in 1959, he had been "doing things for the United States" that "he couldn't discuss" with Pisoney, "but he was helping our country." In addition, Joseph Drozd testified that in the 1970s a cache of buried weapons had been found on the farm in Poland where Edward Drozd had lived two decades earlier, arms that had been "stashed there by the partisan unit that [Edward Drozd] was working with."

On August 19, 1996, the immigration judge issued his decision. Based on Drozd's admis-

sions and the conviction records in evidence, the immigration judge found Drozd deportable and rejected his application for a waiver of deportability under section 212(c) of the 1952 Act, 8 U.S.C. § 1182(c) (repealed Sept. 30, 1996), because he had served more than five years in prison for an aggravated felony. In addition, the immigration judge found that Edward Drozd had not transmitted citizenship to Drozd and ordered him deported from the United States to Poland. Drozd filed a timely appeal to the BIA, which, in a decision dated July 23, 1997, affirmed the immigration judge's decision and dismissed the appeal.

Drozd now seeks review of the BIA's decision.

## DISCUSSION

In his petition for review, Drozd contends principally that his father satisfied the statutory requirements for transmission of citizenship. Alternatively, Drozd contends that the INS is estopped from denying him citizenship and that we should fashion an equitable remedy granting him citizenship because his father could have sought to have him naturalized by filing a petition prior to Drozd's eighteenth birthday, pursuant to section 322 of the 1952 Act, 8 U.S.C. § 1433, had his father known that Drozd was not a citizen.

■ Section 106(a)(5) of the 1952 Act, which governs our review of Drozd's petition, provides in pertinent part:

[W]henever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, th[is] court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court.

8 U.S.C. § 1105a(a)(5). The INS does not contest that Drozd presents a nonfrivolous claim of citizenship. Furthermore, the analysis of whether petitioner has raised a genuine issue of material fact under section 106(a)(5) is similar to that applied in the summary judgment context under Fed. R.Civ.P. 56. *See Agosto v. INS*, 436 U.S. 748, 754, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978). We consider each of Drozd's contentions in turn.

I. *Statutory Requirements for Transmission of Citizenship*

Drozd claims he is not deportable because he is a United States citizen, having derived citizenship from his father, Edward Drozd, who was a United States citizen by birth. Drozd's claim is based on section 301(a)(7) of the 1952 Act, 8 U.S.C. § 1401(a)(7) (presently codified as amended at 8 U.S.C. § 1401(g)), which provided that a person born abroad who had a citizen parent, would be deemed a United States citizen at birth if the parent had been physically present in the United States for ten years prior to the child's birth, at least five years of which were after the parent's fourteenth birthday. The statute also provided that any "periods of employment with the United States Government" by the citizen parent "may be included in order to satisfy the physical-presence requirement" even if the citizen parent was not actually present in the United States. *Id.*

While Drozd concedes that his father was not physically present in the United States for the requisite ten-year period set forth in section 301(a)(7) of the 1952 Act, he contends that he satisfies the statutory requirements for transmission of citizenship because (a) his father had constructive physical presence in the United States; (b) his father fell within the exception to the physical presence requirement for citizens working abroad for the United States government; and (c) section 405(a) of the 1952 Act (Savings Clause) preserved his father's ability to transmit citizenship under pre–1940 laws, *see* 8 U.S.C. § 1101, note.

A. *Constructive Physical Presence*

■ Drozd argues that Edward Drozd maintained constructive physical presence in

the United States long enough to transmit citizenship to him. Specifically, Drozd contends that his father was constructively present from 1940 to 1952, the period in which he wanted to depart Poland for the United States, but was unable to do so because of financial constraints, war and imprisonment. Drozd's contention that his father was constructively present for purposes of section 301(a)(7) of the 1952 Act because he was prevented from coming to the United States by forces beyond his control is contrary both to the plain meaning of the 1952 Act and to the relevant case law.

■ The Supreme Court has observed that "in all cases involving statutory construction, our starting point must be the language employed by Congress, ... and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (internal quotation marks and citations omitted). Here, "[t]he applicable law for transmitting citizenship to a child born abroad when one parent is a [United States] citizen is the statute that was in effect at the time of the child's birth." *Runnett v. Shultz*, 901 F.2d 782, 783 (9th Cir. 1990). Because Drozd was born in 1953, the applicable statute is section 301(a)(7) of the 1952 Act, 8 U.S.C. § 1401(a)(7).

As originally enacted, section 301(a)(7) provided as follows:

(a) The following shall be nationals and citizens of the United States at birth:

. . . .

(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totalling not less than ten years, at least five of which were after attaining the age of fourteen years.

8 U.S.C. § 1401(a)(7). This section also contained an exception to the physical presence requirement, providing that "any periods of honorable service in the Armed Forces of the

United States by such citizen parent may be included in computing the physical presence requirements of this paragraph."

In the 1966 amendments to the 1952 Act, Congress retroactively broadened the single exception to the strict physical presence requirement. *See* Act of Nov. 6, 1966, Pub.L. No. 89–770, 80 Stat. 1322, 1322. Specifically, the 1966 amendments to the 1952 Act provided

[t]hat any periods of honorable service in the Armed Forces of the United States, or *periods of employment with the United States Government* ... by such citizen parent ... may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date.

*Id.* (emphasis added) (codified at 8 U.S.C. § 1401(a)(7)).

Thus, by its plain language, section 301(a)(7) sets forth (1) a precondition to transmission of citizenship from a citizen parent to a foreign-born child, namely, physical presence in the United States for ten years prior to the child's birth, at least five years of which were after the parent's fourteenth birthday; and (2) explicit exceptions to the physical presence requirement. Because Congress has expressly specified certain exceptions from the physical presence requirement of section 301(a)(7), Drozd's request for an additional exception to the physical presence requirement for citizens who could not be physically present in the United States because of financial reasons or war or imprisonment cannot be accommodated "in the absence of evidence of a contrary legislative intent." *United States v. Smith*, 499 U.S. 160, 167, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991) (internal quotation marks and citation omitted); *see B.F. Goodrich v. Betkoski*, 99 F.3d 505, 517 (2d Cir.1996) ("The canon of construction that says 'expressio unius est exclusio alterius' cautions against creating additional exceptions to complex statutory enactments."), *cert. denied*, —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *cf.*

*INS v. Phinpathya,* 464 U.S. 183, 189–90, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984).

Nothing in the legislative history of the 1952 Act dictates a contrary construction. Prior to the 1952 Act, its predecessor, the Immigration and Nationality Act of 1940 (the "1940 Act"), while otherwise providing for similar prerequisites for transmission of citizenship, contained a "residence" requirement rather than a "physical presence" requirement for transmission of citizenship to a child born abroad. *See* Nationality Act of 1940, ch. 876, § 201(g), 54 Stat. 1137, 1139. In the 1952 Act, Congress substituted the "physical presence" requirement to compel a strict adherence to the plain terms of the Act. *See Phinpathya,* 464 U.S. at 198, 104 S.Ct. 584 (Brennan, *J.,* concurring) ("physical-presence" substituted for "more lenient 'residence' requirement" in other sections of the 1952 Act in order to eliminate troublesome problems created by judicial interpretations of residence as allowing extended periods of absence); *Matter of V-,* 9 I. & N. Dec. 558, 560, 1962 WL 12854 (1962) ("There is no indication in the committee reports that the language change was for purposes other than the elimination of troublesome problems involving 'constructive' residence which had theretofore been encountered, and to make it clear that 'residence' meant 'physical presence' and nothing else.").

Moreover, cases have rejected the argument that statutory requirements to transmit citizenship can be "constructively" satisfied. *See, e.g., Runnett,* 901 F.2d at 784; *Rodriguez–Romero v. INS,* 434 F.2d 1022, 1023–24 (9th Cir.1970) (per curiam). In *Runnett,* the Ninth Circuit held that a Canadian citizen's United States mother who resided in the United States for two years and resided abroad thereafter failed to satisfy the statutory residency requirement under the 1940 Act to transmit citizenship to her child born abroad. 901 F.2d at 784. Runnett, like Drozd, cited two BIA decisions to support his claim of constructive satisfaction of the statutory requirements. *Id.* at 784 (discussing *In re Farley,* 11 I. & N. Dec. 51 (1965); *In re Yanez Carrillo,* 10 I. & N. Dec. 366, 1963 WL 12332 (1963)). The Ninth Circuit distinguished the BIA decisions, which suggested

that the theory of constructive residence was available under certain circumstances. It determined that those BIA decisions were not controlling because they applied constructive residence in cases involving retention of citizenship, not transmission of citizenship. Citing *Rogers v. Bellei,* 401 U.S. 815, 821–22, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), the Court concluded that

> courts have traditionally hesitated to find that Congress could take away citizenship without the citizen's consent. This concern has led to the application of constructive residence in order to preserve an individual's retention of citizenship. Similar concern, however, could not exist for the transmission of citizenship where citizenship is simply not being conferred.

*Runnett,* 901 F.2d at 784.

Likewise, in *Rodriguez–Romero,* the Ninth Circuit held the application of constructive residence was inappropriate in a citizenship transmission case. 434 F.2d at 1023–24. There, the court rejected petitioner's claim that he could not be deported following his criminal conviction because he was a United States citizen. *Id.* The court determined that while petitioner's father was a United States citizen, he failed to satisfy the statutory residency requirements for transmitting citizenship to his foreign-born son as he had moved to Mexico in his infancy and remained there for 27 years before returning to the United States. *Id.* The Ninth Circuit, concluding that there was no evidence that petitioner's father maintained his place of general abode in the United States, emphasized that under the 1940 Act, Congress " 'used the term "residence" as plainly as possible to denote an objective fact. . . .' It excluded as a factor, in determining the issue of residence, any subjective intent of the person under consideration." *Id.* at 1024 (citation omitted).

Finally, the other authorities cited by Drozd in support of his claim of constructive physical presence are inapposite. *See Puig Jimenez v. Glover,* 255 F.2d 54 (1st Cir.1958); *Matter of Navarrete,* 12 I. & N. Dec. 138, 1967 WL 13979 (1967). *Puig Jimenez* concerned the interpretation of a statute that conferred United States citizenship upon all

persons born in Puerto Rico on or after April 11, 1899, and residing in Puerto Rico on January 13, 1941. 255 F.2d at 58. The First Circuit found that plaintiff, who was born in Puerto Rico in 1922 and resided in Puerto Rico for fourteen years, but whose return from a visit to Spain was delayed until July 1941 by the Spanish civil war, to be a citizen pursuant to the statute. *Id.* Determining that plaintiff had established her residence in Puerto Rico prior to the trip to Spain, the court found that the involuntary nature of the protracted absence did not deprive her of a residence or general abode in Puerto Rico. *Id.* at 59. Unlike the instant matter, *Puig Jimenez* did not concern the transmission of citizenship by a citizen parent to a child born abroad. Moreover, that case involved the concept of "residence," rather than "physical presence," which, as discussed above, has been applied less restrictively. Thus, *Puig Jimenez* fails to support Drozd's case.

In *Navarrete*, the issue before the BIA was whether a parent's constructive physical presence in the United States for the purpose of retaining her citizenship could also satisfy the physical presence requirement for transmitting citizenship to her foreign-born children. In a prior proceeding, an INS Special Inquiry Officer had determined that petitioners' mother, who had been prevented from entering and residing permanently in the United States by a government official's erroneous interpretation of the law, had constructively completed the necessary physical presence requirement to retain her United States citizenship. *See* 12 I. & N. Dec. at 142. In *Navarrete*, the BIA determined that but for this error, "[t]he same period of physical presence would have qualified [petitioners' mother] to pass on citizenship at birth to [the petitioners]." *Id.* Therefore, the BIA determined that the mother's constructive presence in the United States for retention of her citizenship could be applied also to satisfy the physical presence requirement to transmit citizenship to her children. *See id.*

Here, by contrast, Edward Drozd was not wrongfully prevented from entering the United States to satisfy the physical presence requirements. Despite Drozd's claims that the United States Consulate in Berlin prevented his father's entry back into the United States, the record indicates that consular officials requested documentation, and once Edward Drozd presented the documentation at the United States Embassy in Warsaw, he was issued a passport. Thus, *Navarrete* likewise fails to support Drozd's claim. Accordingly, we find the BIA's rejection of Drozd's claim of constructive physical presence was proper.

B. *Exception to Physical Presence Requirement*

■ Drozd claims that a factual issue exists concerning whether his father comes within an exception to the physical presence requirement for citizens employed by the United States government. According to Drozd, given that (1) a cache of explosives and weapons were discovered on his father's farm in Poland twenty years after his father left the country, and (2) Bill Pisoney testified that Edward Drozd told him "he was doing things for the United States" and "helping our country," an inference can be drawn that his father was recruited to serve the United States when he appeared in Berlin in 1945, and his service continued until repatriation in 1958.

While Drozd properly observes that periods of employment with the United States government fall within the enumerated exceptions to section 301(a)(7)'s strict physical presence requirement, and, therefore, could count towards satisfying his father's physical presence in this country, *see* 8 U.S.C. § 1401(a)(7), Drozd's proffered evidence does not create a genuine issue of material fact as to whether his father worked for the United States government. *See Sierra–Reyes v. INS,* 585 F.2d 762, 764 (5th Cir.1978) (per curiam); *Maroon v. INS,* 364 F.2d 982, 988–89 (8th Cir.1966).

As an initial matter, although Drozd attempts to raise an inference that arms found at his father's farm in Poland were supplied to Edward Drozd by American forces after the war, the record indicates that arms were "stashed there by the partisan unit that [petitioner's] father was working with." Edward Drozd's work with the partisans occurred in the early part of the war and ended

with his capture by the Germans in 1940, before the United States entered World War II. Thus, the cache of buried weapons fails to establish that Drozd's father worked for the government after the war.

In addition, Pisoney's vague testimony that Edward Drozd told him that he was "doing things for the United States" and "helping our country" does not support the inference that Edward Drozd worked as a government employee. Notably, these speculative statements are not supported by any of the official documents Drozd's father filled out in the 1940s or 1950s, nor do these assertions appear on any of the government documents prepared after interviews with Edward Drozd.

In any event, even assuming that Edward Drozd commenced employment with the government on meeting with the American Consul in Berlin and was thereafter imprisoned, Edward Drozd cannot satisfy the physical presence requirement without establishing that he resumed employment with the government upon his release from prison in 1949. There is no evidence to support such employment.

In summary, given that Drozd's averment that his father was employed by the United States government as an agent rests solely on vague and conclusory evidence, Drozd's claim does not create a genuine issue of material fact. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Western World Ins. Co. v. Stack Oil,* 922 F.2d 118, 121 (2d Cir. 1990). Accordingly, we reject Drozd's claim of citizenship on this ground. *See Sierra–Reyes,* 585 F.2d at 764; *Maroon,* 364 F.2d at 988–89.

### C. *The Savings Clause of the 1952 Act*

■ Drozd invites us to exercise our "equitable powers" to exempt Edward Drozd from the physical presence requirement of the 1952 Act by applying the Savings Clause of the 1952 Act to preserve Edward Drozd's ability to transmit his United States citizenship to his son under the pre–1940 laws. *See United States v. Menasche,* 348 U.S. 528, 539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (preserving 1940 Act's more lenient residency requirements pursuant to 1952 Act's Savings Clause). Prior to the enactment of the 1940 Act, a citizen could transmit citizenship to a child born abroad. as long as a residency in the United States for some period prior to the child's birth could be established. *See* Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797, 797. Drozd argues that the Savings Clause manifested "a well-established congressional policy not to strip aliens of advantages gained under prior laws." *Menasche,* 348 U.S. at 535, 75 S.Ct. 513.

The. Savings Clause of the 1952 Act, however, did not extend to transmission of citizenship provisions, but was expressly limited to the preservation of provisions concerning nationality through naturalization and certain other proceedings not applicable here. Section 405(a) of the 1952 Act provided, in pertinent part, that:

> (a) [n]othing contained in this Act, unless otherwise specifically provided therein, shall be· construed to affect the validity of any declaration of intention, petition for naturalization, certificate of naturalization, certificate of citizenship, warrant of arrest, order or warrant· of deportation, order of exclusion, or other document or proceeding which shall be valid at the time this Act shall take effect; . . . ·

> (b) Except as otherwise specifically provided in title III, any petition for naturalization heretofore filed which may be pending at the time this Act shall take effect shall be heard and determined in accordance with the requirements of law in effect when such petition was filed.

8 U.S.C. § 1101, note (internal quotation marks and alterations omitted). In accordance with the plain language of this clause, courts have declined to apply a substantially similar savings clause in the 1940 Act to a claim of transmission of citizenship to a foreign-born child. *See Runnett,* 901 F.2d at 785–86 (substantially similar savings clause of 1940 Act inapplicable to transmission of citizenship); *Rodriguez–Romero,* 434 F.2d at 1024 (same). Drozd, nonetheless, urges us to consider his claim in light of *Menasche,* 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615.

Drozd's reliance on *Menasche* is misplaced. In *Menasche,* the Supreme Court considered whether the Savings Clause of the 1952 Act preserved an alien's rights under the 1940 Act to be naturalized although the alien's petition for naturalization was filed after the passage of the 1952 Act. *Id.* at 529–30, 75 S.Ct. 513. The claim in *Menasche,* therefore, fell within the explicit terms of the Savings Clause of the 1952 Act. By contrast, Drozd's claim of citizenship by transmission does not.

Accordingly, because as a general matter, the Savings Clause of the 1952 Act does not apply to the preservation of a citizen's ability to transmit United States citizenship to his foreign-born child, we decline Drozd's invitation to extend this clause to the preservation of his father's ability to transmit citizenship to him without satisfying the 1952 Act's physical presence requirement.

## II. *Estoppel*

■ Drozd claims that because his father was prevented from returning to the United States in 1946 by the alleged misconduct of a United States Consulate official in Berlin, Germany, the INS is estopped from denying Drozd citizenship. Specifically, Drozd maintains that the United States Consulate in Berlin, Germany "banished Edward Drozd from the American Zone and required him to enter a zone of danger from which he could not extricate himself for 13 years."

■ The doctrine of equitable estoppel is not available against the government "except in the most serious of circumstances," *United States v. RePass,* 688 F.2d 154, 158 (2d Cir.1982), and is applied "with the utmost caution and restraint," *Estate of Carberry v. Commissioner of Internal Revenue,* 933 F.2d 1124, 1127 (2d Cir.1991) (internal quotation marks and citations omitted).

■ Drozd's estoppel claim is belied by the record. A review of the record in this case indicates that when Drozd's father applied for a passport at the American Consulate in Berlin, Germany, consular officials requested that he provide supporting documentation. Edward Drozd returned to Poland to obtain the documentation. Once he presented it at the United States Embassy in Warsaw, Poland on March 29, 1946, the consular officials approved the passport application on July 3, 1946 and obtained an exit permit for him. Edward Drozd was arrested and imprisoned by Polish authorities, however, and therefore was unable to leave for the United States. Based on this record, there is no evidence that any United States official committed any wrongdoing. Accordingly, Drozd's claim falls short of the "affirmative misconduct" that is a prerequisite to estoppel. *City of New York v. Shalala,* 34 F.3d 1161, 1168 (2d Cir.1994); *see also INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982); *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi,* 414 U.S. 5, 7–9, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam).

Nevertheless, Drozd argues that further factfinding surrounding the events at the United States Consulate in Berlin, Germany in the district court may support his estoppel claim. The record before us indicates that no documents exist concerning Edward Drozd's application for a passport in Berlin, Germany after the war. The United States Department of State, in response to Drozd's request for the passport record for his father, located eleven documents from the period of 1925 to 1965, but none of the documents related to his father's application for a passport in Berlin, Germany. Given that Drozd has failed to demonstrate that the agency's search was less than diligent, *see, e.g., SafeCard Servs. v. SEC,* 926 F.2d 1197, 1201 (D.C.Cir.1991), and has not indicated what further factfinding he could obtain regarding these events, Drozd's speculation that more discovery might strengthen his estoppel claim is unavailing.

## III. *Lack of Knowledge of Statutory Requirements*

■ Finally, we turn to an argument that Drozd failed to make before the immigration judge or the BIA. Drozd argues that we should fashion an equitable remedy granting him citizenship based on his claim that had Edward Drozd known that his son was not a United States citizen, Edward Drozd could have sought to have his son naturalized by

filing a petition prior to his son's eighteenth birthday pursuant to section 322 of the 1952 Act, 8 U.S.C. § 1433.

This argument is waived because it was not raised before the immigration judge or the BIA. *See Augustin v. Sava,* 735 F.2d 32, 36 n. 10 (2d Cir.1984); *Der–Rong Chour v. INS,* 578 F.2d 464, 468 (2d Cir.1978); *see also Cisternas–Estay v. INS,* 531 F.2d 155, 160 (3d Cir.1976) ("This court does not sit as an administrative agency and, if counsel wishes to preserve an issue on appeal, he must raise it in the proper administrative forum."). Furthermore, Drozd's request for an "equitable remedy" *granting* him citizenship does not amount to a claim under section 106(a)(5) that he *is* a United States citizen. A claim of citizenship may be raised for the first time on appeal. *See* 8 U.S.C. § 1105a(a)(5) (applying to petitioners who "claim[ ] *to be* ... national[s] of the United States" (emphasis added)); *Valmonte v. INS,* 136 F.3d 914, 918 n. 6 (2d Cir.1998) (a claim of United States citizenship may be raised for the first time in a petition under section 106(a)(5), 8 U.S.C. § 1105a(a)(5)).

We have examined all of Drozd's remaining contentions on appeal and find them to be without merit.

Accordingly, based on the foregoing, we affirm the BIA's order.

### CONCLUSION

The petition for review is denied.