**Haniff MOHAMMED, Petitioner,**

v.

**Janet RENO, et al., Respondents.**

**No. 00–CV–4099(JG).**

United States District Court, E.D. New York.

May 17, 2002.

Allan Sturim, Esq., Sturim and Nizin, Kew Gardens, for Petitioner.

Alan Vinegrad, United States Attorney, Eastern District of New York, Brooklyn, By Scott Dunn, Assistant United States Attorney.

*MEMORANDUM AND ORDER*

GLEESON, District Judge.

Haniff Mohammed committed a property crime in March of 1996. He was convicted by a jury in state court in September of 1997. He was ordered removed by the Immigration and Naturalization Service ("INS") in July of 1999. He petitions pursuant to 28 U.S.C. § 2241, claiming that he was improperly denied the opportunity to seek discretionary relief from an order of removal.

I believe he is right, but a binding decision of the Second Circuit, *Domond v. INS,* 244 F.3d 81 (2d Cir.2001), says he is wrong. Accordingly, I follow *Domond* and deny the petition, but I set forth below, briefly and respectfully, why I believe *Domond* is at odds with controlling case law of the Supreme Court.

*The Facts*

Haniff Mohammed was born in Trinidad on June 20, 1957. He first entered the United States in 1980, illegally. In 1990, he applied for and received amnesty under 8 U.S.C. § 1255(a), as an alien illegally in the United States prior to January 1, 1981. He thereby attained the status of a lawful permanent resident on March 12, 1990.

Mohammed is an auto body repair man. In 1993, he was arrested and convicted on a federal charge in the Middle District of Pennsylvania after he obtained a Pennsylvania title for a stolen Mercedes with an altered vehicle identification number. He

was sentenced to three months in prison, which was followed by a two-year supervised release term.

On March 28, 1996, Mohammed's supervising probation officer visited his home in Queens and found part of a dismantled Mercedes that had been reported stolen. Criminal charges arising out of this event were brought in state court. Mohammed was found guilty by a jury on September 2, 1997, of criminal possession of stolen property in the fourth degree (a Class E felony) and a misdemeanor charge of unauthorized use of a vehicle. On October 14, 1997, he was sentenced to an indeterminate prison term of two to four years for the felony conviction and to a concurrent one-year term on the misdemeanor conviction. After an unsuccessful appeal, Mohammed began serving his sentence on December 4, 1998.

*Procedural History*

While serving his sentence, Mohammed received a notice from the INS to appear for removal on the ground that his conviction for criminal possession of stolen property constituted an aggravated felony. On July 14, 1999, an immigration judge ordered his removal. The judge denied Mohammed's request for discretionary relief from deportation pursuant to the former § 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c). The judge concluded that Mohammed was ineligible for such relief on the ground that

the statute had been repealed. On November 15, 1999, the Board of Immigration Appeals affirmed that decision.

On July 18, 2000, Mohammed filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, asserting that he was entitled to be considered for a waiver of deportation under § 212(c) as it existed at the time of his crime in March 1996.

## DISCUSSION

### A. The Statutory Framework

On April 24, 1996, President Clinton signed the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"), which made certain changes to the INA regarding deportability. For the purposes of this petition, AEDPA's relevant changes included the expansion of the range of criminal offenses that could render an alien deportable[1] and the elimination of discretionary waivers of deportation for those aliens deportable by reason of having committed, *inter alia*, an aggravated felony or a drug offense. *See* AEDPA § 440(d) (amending old INA § 212(c), 8 U.S.C. § 1182(c)).

This scheme was quickly amended once again on September 30, 1996, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). IIRIRA § 304(b) deleted

---

**1.** Previously, an alien could be deported only upon committing a crime of "moral turpitude" that led to an actual sentence of one year or more. Old INA § 241(a)(2)(A)(i)(II), 8 U.S.C. § 1251(a)(2)(A)(i)(II) (1994). AEDPA made deportable any alien who committed a crime of moral turpitude that carried a *possible* sentence of one year or more. AEDPA § 435(A). The statute specified that this change "shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act." *Id.* § 435(b).

AEDPA also amended the definition section of the old INA to expand the list of "aggravated felon[ies]" that rendered an alien deportable. *Id.* § 440(e) (amended old INA § 101(a)(43), 8 U.S.C. § 1101(a)(43)). With one exception, AEDPA specified that the expanded definition of aggravated felony would apply "to convictions entered on or after the date of the enactment of this Act." *Id.* § 440(f).

§ 212(c) of the old INA, which, as stated above, granted the Attorney General broad discretion to waive deportation, and replaced it with a new provision entitled "Cancellation of removal." IIRIRA § 304(a), new INA 5240A, 8 U.S.C. § 1229b. The new provision authorizes the Attorney General to cancel removal (the new term encompassing both deportation and exclusion) for aliens meeting certain criteria.[2] IIRIRA also expanded the list of offenses that qualify as "aggravated felonies." *Id.* § 321(a), 8 U.S.C. § 1101(a)(43).

Following the enactment of these 1996 statutes, aliens convicted of aggravated felonies committed prior to the effective date of AEDPA have sought to be treated in accordance with the law as it existed at the time of their criminal conduct. Specifically, they have sought, in petitions for habeas relief under 28 U.S.C. § 2241, orders directing that they be provided administrative hearings to determine their eligibility for the discretionary waivers of deportation that were authorized at the time they committed the offenses that rendered them deportable. This type of relief from deportation, which has been available in one form or another since 1917, permitted the Attorney General to consider the impact of deportation on an alien's family in the United States, and to waive the grounds for deportation in order to avoid extraordinary hardship on the family. *See Francis v. INS*, 532 F.2d 268, 272–73 (2d Cir.1976). These aliens have argued that the elimination of this form of relief, following the enactment of the 1996 statutes, cannot be applied retrospectively to their criminal conduct. This claim requires an application of the analysis set forth by the Supreme Court in *Landgraf v. USI Film*

*Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

### B. *The Doctrinal Framework: Landgraf*

*Landgraf* is widely regarded as providing needed clarity to the law governing the retrospective application of statutes. Before the case was decided in 1994, there had been growing confusion among the lower courts about whether laws should be presumed to apply retrospectively, or only prospectively. *Id.* at 263–64, 114 S.Ct. 1483. Clarifying an "apparent tension" between two lines of Supreme Court cases, the *Landgraf* court decided in favor of the presumption, "deeply rooted in our jurisprudence," against retrospective legislation. *Id.* at 265, 114 S.Ct. 1483. Reviewing this jurisprudence, the Court noted that the presumption was consistently explained "by reference to the unfairness of imposing new burdens on persons after the fact." *Id.* at 270, 114 S.Ct. 1483. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at 265, 114 S.Ct. 1483. The Court noted that this principle is expressed in several provisions of the Constitution, including the *Ex Post Facto* Clause, the Fifth Amendment's Takings Clause, the Contracts Clause, the prohibition on Bills of Attainder, and the Due Process Clause.

*Landgraf* introduced a two-pronged test for deciding whether a law should apply retrospectively. *Id.* at 280, 114 S.Ct. 1483. First, the court should determine if Congress has expressly prescribed its temporal reach. If so, the inquiry ends there. *Id.* In the absence of such an express statement, the presumption applies, and

---

**2.** The criteria are (1) permanent resident status for at least five years; (2) continuous residence in the United States for seven years;

and (3) not having been convicted of an aggravated felony.

the law will not apply retrospectively if it has "retroactive effect." *Id.*

This second prong—deciding when a statute has an impermissible retroactive effect—is "not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. The inquiry is functional. Even in the absence of an express direction by Congress, the retrospective application of a statute, that is, its application to conduct antedating its enactment, is not necessarily impermissible. "Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment," a judgment informed by "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* at 270, 114 S.Ct. 1483.[3] The Court further explained that a law had an impermissible retroactive effect when its application to events prior to enactment would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280, 114 S.Ct. 1483.

## C. *St. Cyr and Domond*

On August 23, 1999, Judge Alan H. Nevas of the District of Connecticut, deciding three § 2241 petitions, granted habeas relief to three lawful permanent residents—Rohan P. Dunbar, Enrico St. Cyr, and Gyno Domond—who had committed crimes before the changes in federal law removed their eligibility for § 212(c) relief. Judge Nevas held that, under *Landgraf,* the removal of § 212(c) relief could not be applied to criminal conduct completed before the laws were passed. *See Dunbar v. INS,* 64 F.Supp.2d 47 (D.Ct.1999). The

INS appealed in all three cases, though the appeal as to Dunbar was later withdrawn. *See Domond,* 244 F.3d at 84 n. 1.

In deciding the remaining appeals, the Second Circuit twice addressed the continuing availability of § 212(c) relief to aliens who committed aggravated felonies prior to April 24, 1996. On September 1, 2000, the Second Circuit decided the appeal as to St. Cyr, affirming the grant of the writ. *See St. Cyr v. INS,* 229 F.3d 406 (2d Cir.2000). Relying primarily on the *Landgraf* analysis, the court held that § 440(d) of AEDPA could not be applied to aliens who pled guilty to aggravated felonies prior to April 24, 1996, as many such aliens entered their pleas in reliance on the availability of § 212(c) relief. To hold otherwise, the Second Circuit stated, would give the statute an impermissible retroactive effect on such aliens. *See* 229 F.3d at 420.

*St. Cyr* put forward two additional propositions. First, it broadly asserted that, as a general matter, the retrospective application of the bar to discretionary relief from deportation to aliens whose crimes were committed prior to AEDPA and IIR-IRA was permissible:

> As an initial matter, we note that it is difficult to argue that barring eligibility for discretionary relief on the basis of pre-enactment criminal conduct—as opposed to a plea going to the guilt of a deportable crime—constitutes an impermissible retroactive application of a statute. Indeed, we agree that,
>
>> It would border on the absurd to argue that these aliens might have decided not to commit drug crimes, or

---

**3.** This language, *i.e.,* whether the law attaches "new legal consequences to events completed before its enactment," is drawn directly from the Court's *ex post facto* jurisprudence. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) ("A law is retro-

spective if it 'changes the legal consequences of acts completed before its effective date.' ") (quoting *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (cited in *Landgraf,* 511 U.S. at 269 n. 23, 114 S.Ct. 1483.)).

might have resisted conviction more vigorously, had they known that if they were not only imprisoned but also, when their prison term ended, ordered deported, they could not ask for a discretionary waiver of deportation.

> Jurado–Gutierrez [v. Greene], 190 F.3d [1135,] 1150–51 [ (10th Cir.1999) ] (quoting LaGuerre [v. Reno], 164 F.3d [1035,] 1041 [7th Cir.1998] ). Thus, *we conclude that the bar to discretionary relief applies regardless of whether a legal permanent alien's underlying criminal conduct pre-dated the AEDPA or IIRIRA.*

229 F.3d at 418 (emphasis added). Since the court upheld the grant of habeas relief to St. Cyr, this conclusion that other, differently-situated aliens would not be entitled to such relief was *dicta.*[4] *Id.* at 420–21. Second, the court stated that St. Cyr's plea of guilty, not his criminal conduct itself, was the focus of its retroactivity analysis. *Id.* at 418 ("[I]n considering whether the changes to the availability of discretionary relief would alter the legal effect of conduct that predates the AEDPA and IIRIRA's enactment, our analysis focuses on the decision to enter a guilty plea to a crime—not on the criminal conduct—that qualifies the alien for removal under the immigration laws.").

The Second Circuit addressed the issue again in *Domond v. INS,* 244 F.3d 81 (2d Cir.2001), which was decided on March 23, 2001, three months before the Supreme Court's affirmance of *St. Cyr.* Domond was an alien who, like the petitioner in *St. Cyr,* committed an aggravated felony before April 24, 1996. However, unlike St. Cyr, Domond apparently pled guilty to the crime *after* that date. 64 F.Supp.2d at 55 n. 3. *Domond* revisited the issues addressed by *St. Cyr* and adopted its *dicta* as the holding of *Domond.* More precisely, it held that the application of the new statute to deprive Domond of a § 212(c) hearing did not have an impermissible retroactive effect under *Landgraf.* 244 F.3d at 85–86. *Domond* and *St. Cyr* have been interpreted, understandably, to limit the availability of § 212(c) relief to those aliens who were convicted prior to the effective date of AEDPA.[5] Indeed, the lower courts in the circuit have required not only a pre-AEDPA conviction, but a pre-AEDPA conviction on a plea of guilty or *nolo contendere.*[6]

On June 25, 2001, the Supreme Court affirmed the Second Circuit's decision in *St. Cyr. See INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Applying *Landgraf,* the Court first deter-

---

4. Where a pronouncement is not necessary to the resolution of the case in which it is made, the Second Circuit has characterized the pronouncement as *dicta. . See, e.g., Ross v. Artuz,* 150 F.3d 97, 101 (2d Cir.1998) (although *Peterson v. Demskie,* 107 F.3d 92, 93 (2d Cir. 1997), had stated that habeas petitioners whose convictions became final before AEDPA became effective need not be given a full year after the statute's effective date to file their federal petitions, "that statement was not necessary to our decision," and thus was *dicta* ).

5. *See, e.g., Pemberton v. Ashcroft,* 2002 WL 450065, at *3 (W.D.N.Y. Jan.10, 2002); *Romero v. Reno,* 2001 WL 1822329, at *1 (W.D.N.Y. Sept.25, 2001); *Iturralde–Manosalva v. Reno,* 2001 WL 1398689, at *5 (S.D.N.Y. Nov.9, 2001); *Soto v. Ashcroft,* 2001 WL 1029130, at *5 (S.D.N.Y. Sept.7, 2001); *Cinquemani v. Ashcroft,* 2001 WL 939664, at *4 (E.D.N.Y. Aug.16, 2001).

6. In *DiSanto v. INS,* 2002 WL 10448 (S.D.N.Y. Jan.3, 2002) for example, the court held, relying on *St. Cyr,* that aliens "who chose to go to trial cannot be said to have relied in any way on the existence of discretionary relief." *Id.* at *4; *see also Lawrence v. INS,* 2001 WL 818141, at *6 (S.D.N.Y. July 20, 2001) (same; relying on, *inter alia, St. Cyr* and *Domond* ).

mined that Congress had not expressly prescribed that AEDPA applies retrospectively. *See* 121 S.Ct. at 2289. Second, the Court concluded that applying AEDPA to an alien convicted pursuant to a plea agreement entered into prior to AEDPA's enactment would have an impermissible retroactive effect. *See id.* at 2291. "Prior to AEDPA and IIRIRA, aliens like St. Cyr had a significant likelihood of receiving § 212(c) relief. Because respondent, and other aliens like him, almost certainly relied upon that likelihood in deciding whether to forego their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect." *Id.* at 2293. Be-

cause the Court held that St. Cyr's pre-AEDPA guilty plea prevented retrospective application of AEDPA, the Court did not need to address whether, in the absence of such a plea, (1) the bar to § 212(c) relief generally applies to aliens whose criminal conduct pre-dated AEDPA and IIIRA; or (2) St. Cyr's criminal activity could be considered the relevant event for the purposes of *Landgraf*'s retroactivity analysis.

### B. *Domond's Conflict With Landgraf and St. Cyr* [7]

*Domond*, like *St. Cyr*, applied the two-pronged *Landgraf* analysis. On the first

---

7. As set forth in the text below, I suggest that the principal defect of a rule requiring a pre-AEDPA guilty plea in order to be eligible for a § 212(c) hearing is that such a rule conflicts with *Landgraf*. However, it is also true that such a rule, and in particular the rule apparently established by the combination of *St. Cyr* and *Domond*, is fraught with the potential for producing unfair and anomalous results.

Despite its emphasis on the actual reliance of defendants who pled guilty before April 24, 1996, the Second Circuit adopted a more easily administered blanket rule: irrespective of whether he or she actually relied on the availability of § 212(c) relief, any alien who pled guilty (or *nolo contendere*) pre-AEDPA may not be stripped of a § 212(c) hearing by AEDPA. *See St. Cyr*, 229 F.3d at 406 (adopting rule set forth in *Tasios v. Reno*, 204 F.3d 544 (4th Cir.2000)).

This rule, if limited to pre-AEDPA guilty pleas, has the capacity to produce unfairness in particular cases. An alien who sought a speedy disposition of his criminal case (*i.e.*, one before April 24, 1996) in express reliance on the availability of § 212(c) relief, but yet chose to exercise his constitutional right to a jury trial, would get no § 212(c) hearing. An alien who chose to go to trial on an aggravated felony charge precisely because § 212(c) relief was available even in the event of a conviction would get no hearing. An alien who agreed to plead guilty before the cutoff date but entered her plea after it would get no hearing, even if preserving the possibility of § 212(c) relief was her goal in agreeing to

plead guilty. (Consider the application of the rule to two permanent residents, who both agreed with the same prosecutor on March 15, 1996, to plead guilty to a particular deportable offense in express reliance on the availability of § 212(c) relief. If the first alien's plea was entered on April 15, 1996, she would be entitled to a § 212(c) hearing. But if the second alien's plea was not entered until April 30, 1996, due to court scheduling, she would lose the opportunity for § 212(c) relief.)

On the other hand, some wholly undeserving aliens (when viewed from the perspective of the rationale for the rule) would benefit from such a rule. While the Second Circuit in *St. Cyr* indulged the hopeful assumption that defense counsel and judges routinely advise aliens of the immigration consequences of their pleas of guilty—and did so in 1996 as well—many aliens have contended precisely the opposite in habeas petitions challenging their convictions under 28 U.S.C. §§ 2254 and 2255. *See, e.g., Auyeung v. David*, 2000 WL 1877036, at *2–*3 (S.D.N.Y. Dec.26, 2000) (noting absence of constitutional obligation of court to advise of immigration consequences of 1996 plea of guilty; dismissing on exhaustion grounds); *Giwah v. United States*, 1997 WL 232321, at *2 (S.D.N.Y. May 7, 1997) (rejecting on merits ineffective assistance claim based on counsel's failure to advise of immigration consequences of 1995 guilty plea); *Atunrase v. Lacy*, 1996 WL 1088921, at *5 (E.D.N.Y. Sept.5, 1996) (incorrect advice of counsel, before 1991 guilty

prong, the court observed that Congress had not explicitly indicated whether the law should be applied retrospectively—a view that had already been expressed by the Second Circuit, and has since been affirmed by the Supreme Court in *St. Cyr.*

On the second prong, i.e., whether the law attaches "new legal consequences to events completed before [the law's] enactment," *Domond* drew two critical conclusions: (1) that the loss of the possibility of § 212(c) relief was not a sufficient legal interest to be a "legal consequence" under *Landgraf;* and (2) even if it were, the conviction (as opposed to the criminal conduct itself) was the "event" to which the new legal consequences for the purposes of the *Landgraf* analysis. I suggest that the first conclusion is irreconcilable with both the Second Circuit and Supreme Court's *St. Cyr* decisions, and the second is irreconcilable with *Landgraf.*

*Domond*'s conclusion that aliens like Domond and Mohammed never had a right to a waiver of deportation to begin with, and thus the "loss of the Section 212(c) hearings, while clearly a hardship, does

not impose a new legal consequence," 244 F.3d at 86, was premised on the following observations:

> Upon conviction, the punishment for the underlying criminal conduct was and remains some term of imprisonment plus deportation. Domond argues that because the Attorney General traditionally granted a substantial number of Section 212(c) waivers, the loss of a Section 212(c) hearing is significant. The difference, according to Domond, is that before AEDPA deportation was only possible and after AEDPA deportation is certain. This is simply not the case. *Deportation was always the consequence.* Even if the Attorney General granted many of the Section 212(c) waivers, that relief was always discretionary, not mandatory.

244 F.3d at 86 (emphasis added).

The italicized statement is simply inaccurate; deportation was *not* the consequence in more than half of the cases in which the convicted alien received a § 212(c) hearing.[8]  *See St. Cyr,* 121 S.Ct.

---

plea, that defendant would probably not be deported does not constitute ineffective assistance); *El Nobani v. United States,* 287 F.3d 417, 421–22 (6th Cir.2002) (reversing district court's grant of § 2255 motion to vacate plea, despite district court's finding of actual reliance by petitioner on AUSA's misrepresentation of deportation consequences). Such aliens routinely lose those petitions, not despite their claimed ignorance of the immigration laws they benefit (*i.e.,* get a § 212(c) hearing) from the *St. Cyr/Domond* rule, a rule based squarely on notions of reliance.

The *Giwah* case cited above is illustrative. In 1997, Judge Allen Schwartz rejected Giwah's challenge to his 1995 mail fraud, bail jumping and credit card fraud convictions. Giwah claimed that he had received ineffective assistance of counsel because his attorney failed to advise him of the immigration consequences of his plea of guilty before the plea was entered. 1997 WL 232321, at *2. Thus, Giwah obviously did not rely on the availabili-

ty of § 212(c) relief when pleading guilty. Nevertheless, in November 2001, the government submitted for my signature a judgment granting Giwah's § 2241 petition. The proposed judgment, which I signed on November 13, 2001, states that Giwah "is found to be eligible to apply for relief from deportation pursuant to 8 U.S.C. § 1182(c) ('212(c)')." Judgment, *Giwah v. McElroy,* 98 CV 6028(JG)(E.D.N.Y. Nov. 13, 2001).

I do not intend to suggest that Giwah should not have been entitled to a § 212(c) hearing, or to criticize the Second Circuit's adoption of a blanket rule, rather than a rule that would be more difficult to administer. Rather, as stated in the text below, I respectfully suggest that *Landgraf* requires a different approach entirely than one that is premised on notions of actual reliance on preexisting law.

8.  In this case, at the time of Mohammed's offense, deportation was never the conse-

at 2277 n. 5. This part of *Domond* also conflicts with the Second Circuit's decision in *St. Cyr. See* 229 F.3d at 420 (AEDPA § 440(d) and IIRIRA § 304 "alter the substantive rights of aliens subject to removal proceedings because [they] eradicate[ ] a form of relief previously available. By their terms, AEDPA § 440(d)) and IIRIRA § 304 attach new substantive legal consequences to a guilty or *nolo contendere* plea to a deportable crime and would have an impermissible retroactive effect if applied to pre-enactment pleas.". Reconciling these conflicting statements by the Second Circuit is unnecessary, as the Supreme Court rejected this aspect of *Domond's* analysis in its *St. Cyr* decision. *See id.* at 2293 ("[T]he fact that § 212(c) relief is discretionary does not affect the propriety of our conclusion. There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation.").[9]

*Domond's* other basic conclusion was that the statutory bar to § 212(c) relief had no retroactive effect because it did not apply to conduct pre-dating AEDPA § 440(d). Specifically, though *Domond's crime* pre-dated the enactment of the law, his *conviction* did not. Because "the conviction, not the underlying criminal act, ... triggers the disqualification from § 212(c) relief," AEDPA did not have a

retroactive effect when it stripped Domond of eligibility for § 212(c) relief. 244 F.3d at 85–86.

I suggest that common sense requires a different point of reference for the retroactivity analysis. Few people would disagree with Mohammed's assertion that he has been ordered deported because he committed a property crime, not because he was convicted of it a year later. The new laws regarding deportation were intended to affect aliens who commit crimes, not judges or juries who pronounce them guilty.

I recognize that this aspect of *Domond* is drawn directly from the Second Circuit's decision in *St. Cyr.* However, the portion of *St. Cyr* quoted by *Domond* focuses on the pre-AEDPA decision of St. Cyr to plead guilty in reliance on the then-current availability of § 212(c) relief. *Domond,* 244 F.3d at 85–86 (citing *St. Cyr,* 229 F.3d at 418 ("our analysis focuses on the decision to enter a plea of guilty to a crime—not on the criminal conduct—that qualifies the alien for removal under the immigration laws")). As both the Second Circuit and the Supreme Court emphasized, the considerations underlying the *Landgraf* analysis—fair notice, reasonable reliance, and settled expectations—are especially acute when people know and actually rely on the current state of the law in making their decisions.[10] Mohammed's case under

---

quence, at least not for the crimes of which Mohammed was convicted. Theft offenses with a maximum term of imprisonment of less than five years were not deportable offenses at the time of his criminal conduct. His criminal possession offense was made deportable by the enactment of IIRIRA on September 30, 1996, which explicitly stated that its changes to the definition of "aggravated felony" were to be applied retrospectively. *See* IIRIRA § 321(a)(3), § 321(b).

**9.** *United States v. Koziel,* 954 F.2d 831 (2d Cir.1992), upon which *Domond* relies in this regard, indeed addresses the retroactive ap-

plication of a law repealing an immigration-related benefit—discretionary Judicial Recommendations Against Deportation ("JRADs")—but the only issue in *Koziel* was whether such an application violated the *Ex Post Facto* Clause of the Constitution. *See id.* at 832. Neither *Domond* nor this case includes such a challenge, and it is well-settled that deportation is solely a civil penalty, to which the clause does not apply. *See id.* at 834–35.

**10.** *See* 121 S.Ct. at 2292 ("Now that prosecutors have received the benefit of these plea agreements, agreements that were likely facil-

*Landgraf* may be less compelling than St. Cyr's in that Mohammed does not claim that he relied to his detriment on the availability of § 212(c) relief. It does not follow, however, that the *absence* of a pre-AEDPA guilty plea requires the *Landgraf* analysis to focus on a post-AEDPA finding of guilt (by guilty plea or after trial), as opposed to the pre-AEDPA criminal conduct of the alien.

Finally, *Domond*'s focus on the finding of guilt as the relevant event, rather than the alien's criminal conduct, is at odds with *Landgraf*. *Landgraf* was a sexual harassment case, where the issue was whether the new compensatory damages provision contained in the Civil Rights Act of 1991 could be applied retrospectively to pending cases. The operative event for the retroactivity analysis was not the finding of liability, but the unlawful conduct itself:

> In this case, the event to which the new damages provision relates is the discriminatory conduct of respondents' agent John Williams; if applied here, that provision would attach an important new legal burden to that conduct. The new damages remedy in § 102, we conclude, is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent.

511 U.S. at 282–83, 114 S.Ct. 1483. Because at the time of the harassment of Landgraf, the consequences of that conduct did not include compensatory damages for the employer, the Court held that the new damages provision should not apply retrospectively.

Like AEDPA § 440(d), the new statute in *Landgraf* did not "make unlawful conduct that was lawful when it occurred." 511 U.S. at 282, 114 S.Ct. 1483. Also like AEDPA § 440(d), the concerns about fair notice in *Landgraf* were "muted" by the fact that the conduct at issue had already, before the enactment of the disputed statute, subjected the actor to sanctions. *Id.* Finally, there is no evidence in the Supreme Court's opinion that Landgraf's employer had actually relied on the state of the law before the 1991 Act. Indeed, at the heart of my disagreement with *Domond* is its apparent belief that a person who seeks to be treated in accordance with the law as it existed when he engaged in prohibited conduct must have actually relied on the law at that time.

*Domond* stated, and I agree, that "[i]t would border on the absurd to argue that Domond would have decided not to commit a crime if he had known that he not only would be imprisoned, but also could face deportation without the availability of a discretionary waiver of deportation." *Id.* at 86 (citation to *St. Cyr* omitted). *Domond* apparently found this absence of reliance dispositive, *see id.* ("We therefore find no retroactive effect in applying AEDPA § 440(d) to Domond."). Implicit in this conclusion is the premise that an impermissible retroactive effect under *Landgraf* occurs only where a person has knowledge of the law at the time of his actions and actually relies on it. *Landgraf* simply does not support—indeed, it would undermine—that rationale.

Though the Court in *Landgraf* admittedly considered reliance interests, and indicated that the existence of a compensatory

---

itated by the aliens' belief in their continued eligibility for § 212(c) relief, it would surely be contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations' to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief.") (citation omitted); *see also* 229 F.3d at 419 (retroactive application of AEDPA and IIRIRA to defendants who pled guilty in reliance on eligibility for § 212(c) relief would "upset dramatically" this "settled expectation").

damage provision for sexual harassment would have had an "impact on private parties' planning," there is no suggestion in the Court's opinion that Landgraf's employer had actually relied on the state of the law before the 1991 Act. *Id.* at 282, 114 S.Ct. 1483. Indeed, it would likely have bordered on the absurd to suggest Landgraf's employer would have taken stronger action to address her complaints of harassment had it known that it could not only be enjoined and ordered to pay her backpay, but could also be ordered to pay her compensatory damages as well. Yet the Court nevertheless concluded that the compensatory damages provision would operate retroactively if applied to the employer's conduct. To do so "would attach an important new legal burden to" the unlawful conduct. *Id.* at 282–83, 114 S.Ct. 1483. "Even when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past." *Id.* at 282 n. 35, 114 S.Ct. 1483. Attaching a new consequence to past events is significant because "[t]he *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." *Id.* at 283, 114 S.Ct. 1483 (emphasis in original).

I suggest that these principles preclude the application of AEDPA § 440(d) to aliens whose convictions are based on conduct pre-dating April 24, 1996. Depriving Mohammed of any chance for discretionary relief from deportation would attach a significant new consequence to his possession of stolen automobile parts in March 1996. It is true that at the time he engaged in that conduct, he subjected himself to a possible prison term, but he did not subject himself to certain deportation no matter what the consequences to his family. "[T]he 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483 (quoting *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). That principle should apply here to preclude the application of AEDPA § 440(d) to Mohammed.

Mohammed should be entitled to a § 212(c) hearing based on the foregoing principles, not because he relied to his detriment in March 1996 on its availability. Indeed, there is no evidence of such reliance. But Mohammed, like everyone else in our society, is presumed to act against the backdrop of laws that govern their conduct. We neither expect nor require actual knowledge of those laws, or actual reliance on them. Indeed, if Mohammed were to claim that he was unaware that his conviction rendered him deportable, his claim would be rejected out of hand. The "settled expectations" that concerned the Supreme Court in *Landgraf* need not be the actual expectations of a particular actor. If they are, as was assumed with regard to the petitioner in *St. Cyr,* it would be especially unfair to sweep them away with subsequent legislation. But Mohammed may properly assert an expectation that he would receive a § 212(c) hearing based solely on its availability when he committed his crime.

## CONCLUSION

Despite my view that Mohammed is entitled under *Landgraf* to a § 212(c) hearing, I am constrained to follow *Domond,* and thus I deny the petition. The stay of deportation shall remain in effect unless it is lifted by the court of appeals.

So Ordered.